Brassard, J.
On May 20,2003, this court, pursuant to a remand by the Appeals Court, held a two-day evidentiary hearing to determine whether there was a genuine conflict of interest on the part of defendant’s attorney, Paul Cacchiotti (“Cacchiotti”), when he retained the services of James O. Mills (“Mills”), as a private investigator. This alleged conflict occurred during the investigation and trial of rape allegations, which ultimately led to the defendant’s, John Milley (“Milley”), conviction. On June 25, 2002, the Appeals Court issued a remand instructing this court to hold an evidentiaiy hearing to determine whether Milley’s case was inadequately investigated or not investigated at all; and “whether those alleged failures can be linked to the defendant’s assertion of a conflict of interest of his trial counsel (as distinct from mere ineffectiveness not predicated on a genuine conflict) . . .” Commonwealth v. Milley, 00-P-1366, at 6 (June 25, 2002) (Appeals Court Rule 1:28). For the following reasons, Milley’s Motion for a New Trial is ALLOWED.
BACKGROUND
Procedural
On May 10, 1993, Milley was found guilty on two counts of rape. (Ex 23-Docket Sheet.) The trial judge (Roseman, J.) sentenced Milley to six-to-ten years at M.C.I. Cedar Junction. On July 22, 1993, Milley appealed his conviction and on February 15, 1995, the Appeals Court affirmed the conviction. Commonwealth v. Milley, 38 Mass.App.Ct. 1108 (1995). On August 7, 1996, Milley filed with the trial court a motion for a new trial pursuant to Mass.R.Crim.P. 30. On April 2, 1997, the motion was denied. On January 27, 1999, the Appeals Court affirmed the denial of Milley’s motion for a new trial. Commonwealth v. Milley, 46 Mass.App.Ct. 1110 (1999). On June 25, 1997, Milley filed another motion to revise and revoke his sentence. This motion was also denied.
On April 25, 2000, Milley filed with the trial court another motion for a new trial specifically alleging that: 1) newly discovered evidence established that his trial counsel had been acting under a genuine conflict of interest; and 2) counsel who represented him at his motion for a new trial hearing on August 17 1996, was ineffective because he failed to raise the conflict of interest issue. On June 14, 2000, this court (Grabau, J.), denied the motion concluding that Milley’s conflict of interest claim was without merit because Milley’s “submissions raise no issue regarding the underlying issue of trial counsel’s ineffective assistance ... which could not have been raised in his earlier motions or in his appeal.” Commonwealth v. Milley, 00-P-1366, at 2 (June 25, 2002) (Appeals Court Rule 1:28), quoting Commonwealth v. Milley, 91-02797, at 2 (June 14, 2000) (Grabau, J.).
*748 On June 30, 2000, Milley filed a motion for reconsideration, which Justice Grabau denied. On June 25, 2002, the Appeals Court issued a remand on Milley’s motion for a new trial. On May 20, 2003, this court held a two-day evidentiary hearing to make the determinations required by the remand.
Milley’s Trial
The case against Milley was prosecuted by Assistant District Attorney Barbara Piselli (“Assistant District Attorney”). Cacchiotti defended Milley. The case was tried before Justice Roseman. The indictments against Milley included: aggravated rape; breaking and entering with the intent to commit a felony; and assault with a deadly weapon, to wit: a floor. (Ex 27A, 2-9.)
On May 4, 1993, prior to the commencement of trial, the Assistant District Attorney and Cacchiotti appeared before Justice Roseman for pre-trial motions. The Assistant District Attorney had prepared a motion in limine addressing the exclusion of any inquiry into the victim’s past sexual conduct. Cacchiotti objected because he was not prepared for the motion. Cacchiotti represented to the court that he was not prepared because he was only told, “late last night. . . [that] I was going to be here today . . .” (Ex 19, 1-3.)
On May 5, 1993, the rape trial commenced against Milley. In the Commonwealth’s opening statement, the Assistant District Attorney described the relationship between Milley and the victim, Jane Doe (“Jane”)[1] as a dating relationship that had ended in the early spring of 1991. (Ex 27A, 2-30.) She continued to tell the jury that “from the time they broke up until late June or early July, they only saw each other one time. ” (Ex 27A, 2-30.) The Assistant District Attorney then explained to the jury what the evidence would show on the night of the rape.
Counsel described how on July 9, 1991, Jane arrived home at approximately 9:00 p.m. As she opened the door she saw Milley sitting in a corner inside the room. According to Jane, the doors and windows had been locked when she left for work. (Ex 27A, 2-31.) But she later discovered that the screen on one of the two windows had a rip, or had been cut in each bottom comer. (Ex 27A, 2-31.) Jane asked Milley to leave but he refused. They began to argue and Milley then pushed her up against a wall. At that point, Milley raped her for the first time. They continued to struggle and Milley ripped off her nylons and pulled off her underwear. (Ex 27A, 2-32.) As they continued to struggle they fell on the floor. While they were on the floor, Milley picked up her head and smashed it into the floor. (Ex 27A, 2-33.) Milley then again raped her. He then wiped himself off with a pillowcase and left the apartment. Jane remained in the apartment for a period of time. (Ex 27A, 2-33.) Later, she got dressed and walked to a payphone at an Oseo Drugstore where she called the police. (Ex 27A, 2-34.) Officer Scott Stallbaum (“Officer Stallbaum”) and Officer Joseph Gaff (“Officer Gaff j arrived shortly thereafter and observed that Jane was distraught. (Ex 27A, 2-34.) She took the officers back to the apartment and gave them the clothes she was wearing at the time, as well as the pillowcase and sheets. The officers then took her to the hospital for an examination. (Ex 27A, 2-34.) The items were sent to the State Laboratory where they returned positive with seminal fluid. (Ex 27A, 2-34.) The doctors at the hospital sent their tests to the State Laboratory where they came back positive for seminal fluid. (Ex 27A, 2-35.)
In the defense’s opening statement, Cacchiotti suggested to the jury that Milley and Jane did not just have a dating relationship, but rather, a strong sexual relationship. (Ex 27A, 2-36.) Cacchiotti stated that the evidence would support this characterization of the relationship. Cacchiotti discussed that the evidence would show that Milley and Jane had moved and lived together in Colorado between December 1990 and January 1991. (Ex27A, 2-37.) In January 1991, Milley returned from Colorado to check himself into a drug rehabilitation center. Once Milley returned from Colorado he resided with his wife. Jane returned from Colorado in May 1991 and moved into the rooming house in Everett. (Ex 27A, 2-37.) When Jane returned from Colorado she asked Milley to contact her. Jane gave Milley her home address. (Ex 27A, 2-38.) They saw each other on July 6, 1991, and met for drinks. They later returned to the rooming house and talked with a neighbor who was grieving over the death of his girlfriend.
On July 9, 1991, Milley was at her apartment and was able to enter the apartment with a key Jane had given him. (Ex 27A, 2-39.) When Jane came home they had some beers. They started to argue about Milley still being with his wife and the fact that he owed her money from Colorado. (Ex 27A, 2-39.) Milley left the apartment at approximately 9:30 p.m. (Ex 27A, 2-40.) Cacchiotti told the jury that the tests at the State Laboratory were inconclusive because it was never determined that the seminal fluid came from Milley. (Ex 27A, 2-41.)
Over the course of the trial, the prosecution presented several witnesses to testify as to the events of July 9, 1991. The first witness presented was Jane. Jane testified that she first met Milley in the summer of 1990 at a job site, and that they began to date shortly thereafter. (Ex 27A, 2-46.) She then stated that they moved to Colorado in January of 1991 to find work. She obtained a job at the International House of Pancakes as a waitress, but Milley did not find ajob. (Ex 27A, 2-49.) She further testified that their relationship became abusive and that Milley left Colorado so he would not kill her. (Ex 27A, 2-50.) She stated that she returned to Massachusetts for a week, and Milley contacted her at her mother’s house. She then returned to Colorado. (Ex 27A, 2-51.) A month later, *749 Milley arrived uninvited at her home in Colorado. (Ex 27A, 2-52.) He stayed for a week and then returned to Massachusetts. When she returned to Massachusetts she lived at her mother’s house. While living with her mother, Milley often called asking if she had a boyfriend. (Ex 27A, 2-57.) Toward the end of June Milley would call her many times during the day. (Ex 27A, 2-59.) On June 24, 1991, she moved into the Everett rooming house. (Ex 27A, 2-60.) The room was on the third floor. She entered her room by going up the outside stairs located at the back of the house. (Ex 27A, 2-61.) She testified that there was one door and three windows in her room. Two of the windows were positioned on the side of the porch and the other window was across the room. (Ex 27A, 2-61.)
On July 4, 1991[2] at approximately 11:00 a.m., Milley appeared inside her apartment uninvited. (Ex 27A, 2-64.) She said that she panicked and asked him why he was there. He stated that they had a date. When she denied this he said “Well, we do now.” (Ex 27A, 2-66.) In order to get him out of her room she agreed to get a drink with him. They went to a sports bar and then continued drinking at a Chinese restaurant. (Ex 27A, 2-68.) They then returned to her apartment where they met Peter Lacey (“Lacey”). He was upset because his girlfriend had died the previous night. They entered Lacey’s apartment and had a few drinks with him. (Ex 27A, 2-70-71.) After they left Lacey’s apartment they went upstairs to Jane’s room. She testified that he followed her to the room even though she did not invite him into her room. (Ex 27A, 2-73.) When he entered the room he fell asleep on the bed, and she fell asleep on the floor. (Ex 27A, 2-74.) When they woke up Milley told her he had to leave. She walked him to the bus. (Ex 27A, 2-75.) Milley wanted her to meet him in Waltham that night. She refused and told him that they did not have a relationship. (Ex 27A, 2-76.) Jane did not talk to Milley again until the morning of July 9, 1991.
On July 9, 1991, at approximately 8:30 a.m., Milley called and asked to see her. (Ex 27A, 2-79.) She testified that he called her a few times that morning, and finally she told him to call her later that day. At that point she had decided to meet him so she could explain to him that they were not in a relationship. He did not call her back. (Ex 27A, 2-79.) She left work at 8:00 p.m. and arrived home at 9:00 p.m. (Ex 27A, 2-80.) As she entered her room she noticed that it was very dark and all the shades had been pulled down. Once she was inside she heard Milley’s voice asking her where she had been that evening. (Ex 27A, 2-82.) She turned on the light and saw him sitting in a chair, drinking a beer. He asked if her boyfriend, George Mor (“Mor”), had dropped her off. (Ex27A, 2-83.) She asked him to leave and he responded that he loved her. (Ex 27A, 2-84.) Jane told him that she did not want him in her life. She again asked him to leave and told him that they had no future. As she was making these statements he became angiy and came towards her punching his fists. (Ex 27A, 2-86.) Jane opened the door so he could leave. (Ex 27A, 2-87.) After Jane again told him to leave he pushed her against the wall and pinned her arms above her head. (Ex 27A, 2-88.. At that point he began to touch her body and rape her. (Ex 27A, 2-89.) Jane kept asking him to stop. She then tried to scream but he threatened her saying that he would kill her if she screamed. (Ex 27A, 2-90.) He then threw her on the bed. As he was on top of her he took off her nylons and underwear. (Ex 27A, 2-91.) She then stated that they struggled and she tried to kick and punch him. (Ex 27A, 2-93.) As they were struggling the mattress fell off the bed. (Ex 27A, 2-94.) He then pulled her hair and she bit him on his shoulder. (Ex 27A, 2-95.) At that point he threatened to kill her and then proceeded to bang her head on the floor. He then penetrated and ejaculated inside her, stood up, and wiped himself off with a pillowcase. (Ex 27A, 2-97.) As he was leaving he threatened to hurt Mor and said that he was going to get her fired at work. (Ex 27A, 2-98.) Jane testified that he left at approximately-9:40 p.m. She then went on to her porch and saw Lacey. She did not know what to tell him so she went back inside. (Ex 27A, 2-98.) She stayed in her room for a couple of hours because she was waiting for Mor and she worried that Milley would ambush him. (Ex 27A, 2-99.) She finally cleaned herself up and went to a nearby payphone at the Oseo Drugstore. (Ex 27A, 2-100.)
While at Oseo Drugstore she first called Mor and then called the Everett police. (Ex 27A, 2-101.) Officer Stallbaum and Officer Gaff arrived five minutes later. They returned to her apartment where she showed the officers the clothes, sheet, face cloth, pillowcase, nylons, and mattress. (Ex 27A, 2-102.) The officers then took her to Beth Israel Hospital for an examination. (Ex 27A, 2-111.)
At the end of the direct examination, the Commonwealth asked Jane about the screen in her window. Jane testified that there were no rips in the screen when she left for work that morning. (Ex 27A, 2-116.) The Commonwealth’s direct examination concluded.
Cacchiotti then began his cross-examination. He started by asking Jane questions about how she met Milley, how long they dated, and whether they had a sexual relationship. (Ex 27A, 2-120-23.) He then had her testify that it was Milley’s idea to go to Colorado and that she agreed to accompany him. (Ex 27A, 2-124.) Cacchiotti then asked if she knew that Milley left Colorado so he could check himself into McLean Hospital’s alcohol and drug rehabilitation program. Jane stated that was what Milley had told her. (Ex 27A, 2-127.) When questioned about why she returned to Massachusetts she stated that she had unfinished business that lasted a week and then she returned to Colorado. (Ex 27A, 2-131.) She then stated that in May 1991 she decided to move back to Massachusetts and *750 that she gave Milley her mother’s phone number. (Ex 27A, 2-136.)
Cacchiotti then asked her about her rooming house and if she knew the name of the landlord. Jane could not recall and Cacchiotti asked if the last name Molly sounded familiar. She replied affirmatively. He then asked her if she knew the maintenance individual by the name of Arthur. She said that he collected the rent. (Ex 27A, 2-136, 137.) Cacchiotti then had her correct the statement that she lived on the second floor and not the third floor. (Ex 27A, 2-137.)
Cacchiotti then referred to the grand jury testimony and had her read from line nineteen on page six to line six on page seven. (Ex 27A, 2-139.) The testimony provided that she told Milley that she lived on Broadway in Everett but did not specify the number of the building. (Ex 27A, 2-140.) He had her admit that she gave Milley her address sometime before he met her on July 6, 1991. (Ex 27A, 2-141.) Jane then repeated her prior testimony that Milley arrived unannounced at approximately 11:00 a.m, and admitted that the door had been unlocked and opened. (Ex 27A, 2-142.) Jane stated again that she and Milley went for drinks and that they later visited with Lacey for approximately forty-five minutes. (Ex 27A, 2-143.) She explained that Lacey’s room was one floor below her room and that it was located by the stairs. (Ex 27A, 2-144.) After they left Lacey’s apartment Milley came into her room and they fell asleep.
At that time, Cacchiotti asked if she had the same sheets on the bed between July 6 and July 9, in an attempt to elicit testimony that Jane and Milley engaged in sexual activity on the night of July 6. Jane denied that she engaged in any sexual activity. (Ex 27A, 2-145.) During cross-examination Jane also admitted that she had probably indicated to Milley the number of her rooming house on Broadway. (Ex 20, 3-6.) Cacchiotti then proceeded to ask questions about the size of her room and bed. (Ex 20, 3-7.) As they discussed the night of the incident, Cacchiotti entered into a line of questioning regarding her nylons. (Ex 20, 3-8.) Jane testified that as Milley was lying on top of her, he took off her nylons with his right hand and held her wrists with his left hand. (Ex 20, 3-8.) She was not able to explain how seminal fluid was found on the nylons if they were not on her body when she was raped by Milley. (Ex 20, 3-93-14.)
Cacchiotti then began to question Jane about her boyfriend, Mor. Jane testified that she was expecting Mor at 9:30 p.m. on the night of the incident. (Ex 20, 3-15.) She also testified that the incident with Milley lasted for thirty-five minutes. (Ex 20, 3-16.) Cacchiotti followed up with a line of questioning regarding what occurred as she fell on the floor with Milley. She testified that she kicked the walls and screamed hoping to get the attention of the other occupants. (Ex 20, 3-22.) She then explained that as she was struggling with Milley, the mattress which was four feet wide fell off the bed into a two feet space. The mattress was hanging off the bottom of the bed, tilting at an upward angle. (Ex 20, 3-26-27.) Cacchiotti concluded his examination by asking about her hospital visit and if she had any cuts or abrasions. (Ex 20, 3-28.) In response to the question, Jane stated that she did not think she had any scrapes or abrasions.
On re-direct, the Assistant District Attorney questioned Jane about when she removed her underwear. Jane testified that when she left the apartment she put the underwear on the floor. (Ex 20, 3-29.) The Assistant District Attorney then asked about the windows in her apartment. She stated that the window by the door had a screen and the other window had only a storm window. (Ex 20, 3-29.) The Assistant District Attorney also elicited testimony from Jane that when Milley penetrated her they were on the floor, and not on the sheets which were on the bed. (Ex 20, 3-31-32.) On re-cross, Cacchiotti challenged Jane’s testimony regarding which windows had locks and were actually locked. (Ex 20, 3-33-34.)
The next witness the prosecution called was Isabelle McNeil (“McNeil”). On July 9, 1991, she lived on the first floor in “Room Two” at the rooming house in Everett. (Ex 20, 3-39.) During this time she worked as an Assistant Activities Director at the Chelsea Jewish Nursing Home. She testified that on July 9, 1991, she worked “from 12:00 o’clock in the afternoon, till probably about 8:30 at night.” (Ex 20, 3-40.) She took public transportation home and arrived at the rooming house between 9:00 p.m. and 11:00 p.m. (3-40.) After she arrived home she had some dinner and watched television. (3-41.) After she had been home for a short time she heard loud noises, banging, and screaming coming from the apartment above her room. (3-41.) McNeil specifically heard someone scream: “Get away from me, leave me alone. Somebody help me.” (3-41-42.) After the screams she heard someone running down the stairs. At that time she looked out the window and saw a man running down the stairs, jump off the porch, and over a fence. (3-43.) McNeil did not know the man but described him as a tall man with broad shoulders, heavy set, with dark hair and a beard. (3-43.) While on the witness stand McNeil pointed to Milley as the man she saw that night. (3-43.) She further testified that after she observed the man leaving the rooming house the police arrived shortly thereafter. (3-44-45.) She saw a woman talking with the police and she had a blanket over her shoulders and she was wearing jeans. McNeil did not know the woman. (3-44-45.)
During cross-examination, Cacchiotti focused on a photo lineup viewed by McNeil and her statement that she made to the police. Cacchiotti asked McNeil if she had viewed a photo lineup. McNeil replied that it had been two years ago and she could not recall if she had looked at photos. (3-45.) McNeil did recall making a statement to the police; however, she could not recall *751 what she told the police. (3-46.) Cacchiotti asked her if she recalled not picking Milley out of a photo lineup. McNeil responded that she did not remember seeing photos. (3-46.) Cacchiotti then asked her how long it took for the police to arrive. She stated that it was less than five minutes. (3-47.) With these responses Cacchiotti completed his cross-examination.
The next witness for the prosecution was Officer Gaff. He testified that at approximately 11:30 p.m., he and his partner, Officer Stallbaum, received a call to assist someone at the Oseo Drug parking lot.[3] (3-50-51.) When they arrived they observed Jane crying and looking very scared. She told them that she had been raped by Milley. (3-52.) They proceeded to take her back to the rooming house where they investigated her room for approximately thirty minutes. (3-53.) He then took her to Beth Israel Hospital for an examination. Jane still appeared nervous and very upset on the way to the hospital. Officer Gaff testified that he was with her for forty-five minutes and that it was his observation that she had not been intoxicated. (3-54.)
On cross examination, Officer Gaff testified that he did not take any photographs but that after they notified the police station, Lieutenant Ferullo came to the scene and took the photographs. (3-55-56.) Cacchiotti’s final inquiry of this witness was whether he observed bruises or adhesions on Jane’s body. Officer Gaff responded “No,” he had not observed any bruises or adhesions. (3-56.) The trial judge then asked Officer Gaff if he ever spoke with McNeil. Officer Gaff stated that he did not, and that he only spoke with a gentleman.
The next witness called by the prosecution was Jennifer Shaw (“Shaw”). She was working as a resident in the field of gynecology and obstetrics at Beth Israel Hospital on the night of the incident. (3-58-60.) Shaw testified that prior to July 1991 she had examined on an emergency basis forty women who had been sexually assaulted. (3-62.) She described Jane as distraught and able to answer questions, but hesitant at times. (3-64.) Jane gave Shaw the same information she told Officer Gaff. (3-70.) Shaw noted during the examination that Jane had tenderness on the back of her scalp, bruises on her breasts, and abrasions, similar to a rug bum, on her back and left lower leg. (3-73, 3-75.) As she performed the pelvic examination she observed discharge that was consistent with semen. (3-76.) Shaw also performed a bimanual examination which checks for tenderness with the utems and ovaries. She explained to the juiy that any tenderness would be consistent with forcible intercourse. (3-77.) Shaw determined that Jane had this tenderness. She concluded the examination with collecting specimen by swabbing Jane’s vaginal area. (3-79.)
On cross-examination, Cacchiotti asked if there were other reasons for tenderness of the utems such as infection, mass, or menstrual cycle.[4] (3-85-87.) Shaw stated that she concluded the tenderness was a result of forcible intercourse based upon the information provided by Jane and the results of the physical examination. (3-88.)
The next witness called by the prosecution was Officer Stallbaum. His testimony was consistent with Officer Gaffs regarding the meeting with Jane in the parking lot at 11:30 p.m. (3-93-96.) When Officer Gaff took Jane to the hospital, Officer Stallbaum stayed in the apartment until Detective Bontempo arrived at the scene. (3-97-100.) While in the apartment he took the clothing, underwear, and face cloth, and placed them in evidence bags. (3-97.) He then observed the windows in Jane’s room. He noticed the window farthest from the door was a glass window with no screen. (3-98.) He then observed the window closest to the door as a “double-hung window” that slides up. This window had a screen and was in the up position. (3-98.)
He then left the apartment and went to the hospital to interview Jane. (3-101.) He was accompanied by Officer Strong as he interviewed Jane. (3-102.) In the interview, Jane told him that when she came home from work Milley was in her apartment. She then described how Milley pushed her against the wall, grabbed her above the elbows with his hands, and threw her on the bed. (3-102.) At that point, Officer Stallbaum checked Jane’s arms for bmises which would be consistent with her stoiy. He found three to four small bmises. (3-102.) She continued stating that Milley then climbed on top of her, took her hands, and held them behind her head. (3-103.) She attempted to crawl out from underneath him, but the mattress slipped off the bed, forcing her to fall head first onto the floor. While she was at that angle, Milley pulled off her nylons, and as she began to fall, pulled off her underwear. She then began to scream and he covered her mouth with his hands and threatened to kill her. (3-103.) He grabbed her hair and banged her head against the floor. (3-103.) He then had intercourse with her and left. (3-104.) After the interview which was at approximately 1:00 a.m., Officer Stallbaum took the evidence collected from the apartment and the physical examination to the State Police laboratory. (3-106.)
Cacchiotti’s cross-examination centered around the window screen. (3-110.) Officer Stallbaum testified that the screen was split which is a sign of a forced entry. However, he did not know the condition of the screen prior to the night of the incident. (3-111.) He also did not see any broken glass or broken locks. (3-112.) Cacchiotti then asked if Officer Stallbaum had interviewed any witnesses that night. Officer Stallbaum testified that he did not take any witness statements that evening. (3-119.) Cacchiotti then questioned Officer Stallbaum about his observations regarding the position of the mattress. Officer Stallbaum testified that he observed the mattress to be slightly to the left but primarily still on the bed. *752 (3-122.) He ended his testimony by stating that Jane had told him that she had locked all of the doors, windows, and screens before she left for work that morning, and that she left one window open. (3-126). After Officer Stallbaum’s testimony the Commonwealth rested.
Cacchiotti presented one witness, the defendant, Milley. Milley began his testimony by describing that he met Jane at a work site in August of 1990. (Exhibit 27B, 4-4.) They began to date in September. (4-5.) He discussed their dating and sexual relationship. (4-8.) As to moving to Colorado, Milley explained that he had been laid off and there were not any jobs in Massachusetts. He decided to move to Colorado and Jane accompanied him. (4-14.) When they arrived in Colorado he found a job as a contractor. (4-15.) He then left Colorado in January 1991 because he felt he had a drug and alcohol problem and wanted to treat it. (4-16.) He moved back to Massachusetts and checked himself into McLean’s Hospital in Belmont, where he stayed for three weeks. (4-16.) In February 1991, Milley was released from McLean’s Hospital and he returned to Colorado. (4-18.) He only stayed there for two weeks because he started doing drugs and wanted to return to Massachusetts. (4-19.) He then testified that when Jane returned from Colorado she was living at her mother’s house. During this time they continued to date, and saw each other every night. (4-22.) In June, Jane told Milley that she had found a room and gave him the address. (4-22.) On the day of July 6,1991, he met her at her room. He did enter without knocking but testified that there was no need to knock because she saw him in the doorway. (4-24.) Milley’s testimony of the events that occurred on July 6, 1991, conflicted with Jane’s testimony regarding the events that occurred once they left Lacey’s apartment. (4-25-27.) Milley testified that after they left Lacey’s apartment, Jane did not verbally ask him to come in or not to come in her apartment. (4-27.) Once they were in her room they had intercourse. (4-28.) While they were having intercourse the mattress fell on the floor. (4-28.) They then fell asleep.
When he was leaving Jane gave him a key to the room because they made arrangements to see each other that Tuesday to watch the All Star Game. (4-29-30.) On Tuesday, July 9, 1991, he arrived at Jane’s room at approximately 7:00 p.m. He brought over a pizza and beer. (4-30.) He entered her apartment with the key. (4-31.) At this point, Cacchiotti began to question Milley about the incident. Milley testified that they watched some of the game and then had sexual intercourse (4-34.) He stated that Jane approached him and started to kiss him. They then proceeded to engage in sexual activities. He admitted to taking her nylons and underwear off. (4-41.) As they were engaged, the mattress once again fell off the bed. (4-36.) Milley stated that Jane never told him to stop. (4-36.) When they were done they put the mattress back on the bed. (4-41.)
After engaging in intercourse they started talking. Milley told her that he was thinking of getting back together with his wife. (4-37.) They then got into an argument and words were exchanged. While they were arguing he left her room, walked down the stairs, got into his car, and drove home. (4-38.)
On cross-examination Milley admitted to initiating the calls both in Colorado and Massachusetts, and that Jane did not have his home number. (4-43.) He testified that on July 6, 1991, he followed Jane up the stairs to her room at the end of the day because she said to him, “Let’s go.” (4-49.) As to the key, Milley could not recall where the key was or if he still had the key. (4-52.) Regarding Jane’s boyfriend, Milley stated that he did not know she. was dating Mor until later that night, but he was not jealous of the new boyfriend. (4-55.) The Assistant District Attorney then questioned Milley about the rape allegations. Milley admitted that sometimes he did hold her wrists when they had intercourse, but he could not recall if he did it on the night of the incident. (4-56.) He denied ever pinning her up against the wall. (4-56.) Milley did admit to undressing her and that he also undressed. (4-59.) He also admitted that they both engaged in oral sex. (4-61.) Milley further testified that when the mattress fell off the bed, he fell over Jane, but that there was never a struggle. Once the mattress fell to the floor, they continued to have intercourse on the carpeted floor. (4-65-67.) After having intercourse he stayed in the apartment for approximately thirty to forty-five minutes. (4-68.)
Once the Assistant District Attorney completed her examination, Cacchiotti asked Milley some follow-up questions. Milley reiterated his testimony that the sex was consensual and that he never threatened or hit Jane.
While deliberating the jury returned with the question, “Is there a police report?” The trial judge told them that the police reports were not entered into evidence and that they must continue their deliberation without them. (4-155.)[5] After resuming deliberations the jury returned with not guilty verdicts with respect to the breaking and entering, and the assault and battery. The jury found Milley guifiy of rape. (4-158-60.)
Scheme
Milley asserts that Cacchiotti had a conflict of interest while he represented Milley because of his involvement in a kickback scheme (“scheme”). The scheme allegedly occurred in the early 1990s involving Joseph Marshall (“Marshall”), the former assistant clerk of courts, Mills, Robert Shell (“Shell”), a former assistant clerk, and four attorneys. See Commonwealth v. Milley, 00-P-1366, at 2 (June 25, 2002) (Appeals Court Rule 1:28). The scheme allegedly occurred as follows: Marshall would appoint the four attorneys to represent indigent defendants. The attorneys would be paid for their services by the Committee for Public Counsel Services (“CPCS”). In exchange for receiving assignments the lawyers would file motions for funds to hire Mills. Marshall would allow the motions. In exchange for allowing the motions, Mills would give kickbacks to Marshall. See id. at 2-3. See also Commonwealth v. Mills, 436 Mass. 387, 389-90 (2002). An *753 investigation into the scheme occurred after several defendants complained of inadequate investigation in their cases. After investigation of these complaints, it became clear that Mills could not have completed the investigations that he was paid to conduct. See Milley, 00-P-1366, at 3.
Marshall was indicted and pled guiliy to six counts of soliciting and receiving illegal gifts and filing false reports to the state commissioner. (Ex 23.) Mills was convicted by a Superior Court jury of three counts of larceny from the ciiy of Boston; two counts of larceny by false pretenses from CPCS; three counts of perjury; two counts of procurement fraud; two counts of making false claims; and four counts of failure to make tax returns. See Commonwealth v. Mills, 436 Mass. 387, 389 (2002). Shell pled nolo contendere as to the charges against him. (Ex 24.) None of the attorneys was ever indicted or convicted for their alleged involvement.
a. Mills Trial
On October 1, 1997, the second-day of the criminal trial against Mills, Mary Aufiero (“Aufiero”), took the stand as a witness for the Commonwealth. In response to the Assistant District Attorney's questions she explained that she had worked for the Middlesex Superior Court for fourteen years, ten years as a deputy assistant clerk assigned to the First Session Criminal. (Ex 25-183.) She explained to the jury that the session is an administrative one where the court hears arraignments and bail petitions, defendants receive their court-appointed attorney, and attorneys file motions for funds for their private investigators. (184.) She was then asked if she knew Mills, to which she replied, “Yes.” (184.) She testified that she met Mills ten years ago when she started her position in the criminal session. Between 1993 to 1995, she saw Mills everyday. (185.) She saw Mills either in Courtroom 6B or in Marshall’s office. (186.) She then explained that Marshall was the clerk magistrate and that part of his job was to appoint attorneys to indigent defendants, and to approve motions for funds to hire private investigators. (186.)
The Assistant District Attorney then asked Aufiero to explain the process of an attorney being assigned to cases. She explained that there was a master list of bar advocates and each attorney on that list would be assigned one day. She believed there were thirty to sixty attorneys on the list. The attorneys were on a rotating schedule, allowing each attorney to have a “duty day” every thirty or sixty days. There was no limit on how many appointments that attorney would receive on his “duty day.” (188-89.) Aufiero explained that if the duty attorney was not in the courtroom, the clerk would page that attorney to the courtroom to receive his appointment. Aufiero then testified that she worked for six other clerks and that Marshall was the only clerk who would deviate from this procedure. (193.) If the duty attorney was not in the courtroom and a defendant needed an attorney, Marshall would never page the attorney but instead, depart from the list, and choose an attorney from the audience. (194.) He usually picked four attorneys, one of whom was Cacchiotti. (189.) She explained that these four attorneys used the same investigator, Mills, and that in every single case they would file for investigator fees. (191.)
Aufiero then explained that motions for funds were done on the record in the open courtroom. (195.) However, Marshall wouldfor those four attorneysdo the motions off-the-record in his back office. (196.) With a stamp he would stamp “Motion Allowed” and sign it. (196.) Aufiero would see the motions after he approved them because she would have to docket the motions and send them to the clerk’s office to be entered into the computer. (197.) She also stated that Mills was present “all the time” while Marshall was stamping the motions. (197.) She believed they were friends because Mills was in his office on a daily basis, for at least three hours a day. (198.) She also often saw Cacchiotti in the back office with Marshall. (198-99.)
Aufiero then described the Notice of Assignment of Counsel form (“NAC”). This form included information as to who was assigned to a case, the date of assignment, the charges, and docket number. (205.) There were six copies of the form in six different colors. The green copy would go into the defense file. Toward the end of 1994, Marshall asked Aufiero to take the pink copy and file it in a binder which was kept in his office. (204-05.) She would see Marshall and Mills going through the binder counting the number of appointments obtained by each of the four attorneys. (206.) The Assistant District Attorney then asked how much money was requested for Mills’ fees. She responded that when one of these attorneys were assigned a case, Mills would receive $1000 per appointment. (215.)
On cross-examination she acknowledged that she had not worked with Marshall until April of 1994, after there was a change in how cases were administratively processed. (216-18.) She also acknowledged that before 1994judges appointed the attorneys to cases, but only if they were the duly attorneys. (222.) The attorney then examined her about other attorneys who used Mills. Aufiero was not sure what other attorneys hired Mills, but was definite on the four above-mentioned attorneys because they would put Mills name on the motion, or Mills himself would bring in the motion. (227-29.) On cross-examination, the attorney attempted to have Aufiero admit that attorneys were always in Marshall’s office to discuss scheduling. She admitted it was true that attorneys did meet with Marshall in his office to discuss scheduling, but Cacchiotti and the other three attorneys were in the office much more often, and often were there to socialize, and not for scheduling purposes. (236-37.) She continued to state that even when the four attorneys did not have cases or were not on the bar advocate list for that day, they would be in the courtroom. (239.)
*754 Mills’ attorney then asked whether attorneys were called when they were not on the list. Aufiero explained that it was not done on a regular basis but only in specific circumstances. For instance, if a defendant requested that his attorney be removed from the case, another attorney would have tobe appointed. The clerk magistrate would call on the attorney who had particular experience in that criminal area. (Day 3-21.) The cross-examination then led into the NAC forms. She explained that these forms were sent to the Committee for Public Counsel Services (“CPCS”) and it was based on these forms that the attorney would get paid. (30). She stated that Marshall would make notations as to the information on these forms and then he would throw the notes away. (31.)
On re-direct, Aufiero testified that, prior to 1994, Marshall controlled one-fifth of all the attorney appointments in a given week. (37.) In April 1994, Marshall controlled all of the attorney appointments. (37.) She then clarified that Marshall would always assign the cases to the four attorneys, even when there was not an extraordinary circumstance, such as a defendant requesting a new attorney. (39.) The Assistant District Attorney concluded by asking her if Marshall and Mills had ever vacationed together. She replied that Mills and Marshall did take a vacation to Hawaii and that Mills had shown her pictures from their vacation. (41.)
On appeal, the Appeals Court and the Supreme Judicial Court upheld Mills’ sentence with regard to the three counts of larceny from the ciiy of Boston; two counts of larceny by false pretenses from CPCS; three counts of perjury; two counts of procurement fraud; two counts of making false claims; and four counts of failure to make tax returns. See Commonwealth v. Mills, 436 Mass. 387, 389 (2002).
b. Shell’s Grand Jury Testimony
Shell was indicted on two counts of accepting cash and gifts for his official acts. Specifically, Count I stated: “from on or about March 1, 1992, to on or about September 30, 1995, as a state employee, did, . . . directly accept or receive approximately $1,500 in cash from James Mills, for or because of official acts... within his official responsibilities . . .” (Ex 11.) Count II stated: “from on or about March 1, 1992, to on or about September 30, 1995, as a state employee, did, . . . directly accept or receive $1,200 in cash, and free lodging at a Florida condominium from Paul Cacchiotti, for or because of official acts ... within his official responsibilities . . .” (Ex 11.) On August 7, 1998, Shell plead nolo contendere to these charges. (Ex 24.)
On December 15, 1997, Shell gave testimony to a grand jury investigating the scheme. (Ex 24.) While Shell was employed with the Middlesex Superior Court, he was an assistant clerk, and his last year there he was an assistant magistrate. (7.) He explained that as an assistant clerk he prepared the courtroom for the judge. He made sure the court staff was in the courtroom and that all the motions and files needed for the day were in the courtroom. (8.) Regarding motions the attorneys would hand him their motions and he would hand them to the judge. (9.) He further stated that he knew Paul Cacchiotti and that he would see him daily in court. (10.)
The attorney then asked Shell if Cacchiotti ever gave him anything of value. He stated that Cacchiotti would give him money and the use of his condominium in Florida. (11.) Cacchiotti would enter Shell’s back office and give him cash in increments of $100, totaling between $1000$1400. (12-13.) Once he was sworn in as assistant magistrate Cacchiotti stopped giving him cash. (14.) Regarding the condominium he was not sure who owned it. He thought that Cacchiotti solely owned it, but later understood that Mills owned it in 1991. (14.)
Shell said he knew Mills. Mills would give him motions for funds and he would take the motions to the judge. (17.) Since Mills was not a member of the bar he could not submit the motion in open court. Mills would also give him cash probably totaling in the amount of $1200. (17.)
Shell also explained that Marshall and Mills were friends. He also stated that Mills was always in Marshall’s office. (19.) A grand juror then asked why he thought he was receiving the money. Shell responded that at first he thought it was because they were friends, but later learned that they thought they were paying him off. (19.) He explained that Cacchiotti and Mills thought they were paying him off for processing their motions promptly, and not having to wait the standard twenty-four hours. (20.)
After Shell gave testimony Peter Darling (“Darling”), an investigator for the Attorney General’s office, took the stand. He was asked questions regarding a deed. He testified about the deed for property located at No. 50 Walton Manor in Florida, and said that as of June 1992, the owner of the property was Cacchiotti. (22.) According to the deed, Mills sold the condominium to Cacchiotti. (22.)
The Evidentiary Hearing
Pursuant to the Appeals Court remand, this court held an evidentiary hearing on Milley’s motion for a new trial. Commonwealth v. Milley, 00-P-1366, at 6. Hearings on this motion took place on May 20, 2003 and May 21, 2003. At the hearing, Milley called four witnesses. The court heard testimony from Milley and Cacchiotti. Marshall was subpoenaed to appear before this court, but he refused to testify and invoked his Fifth Amendment right against self-incrimination. McNeil was also subpoenaed, but was unable to testify because of a physical condition. Instead, an affidavit she signed was placed into evidence on her behalf. Mills was not called to testify because his residence is in New Hampshire and beyond the reach of service of process.
a. Milley’s Testimony
Milley began his testimony by describing his initial contact with Cacchiotti. On September 6, 1991, Cacchiotti was appointed to represent Milley. In December 1991, Milley met with Cacchiotti for the first *755 time. During this meeting Milley described the facts and provided Cacchiotti with a list of potential witnesses including their addresses and phone numbers. The witnesses included McNeil and Lacey. He also provided the names of the two establishments that he and Jane had visited prior to the incident. At the conclusion of this meeting, Cacchiotti told Milley that he would have the incident fully investigated.
Milley did not have any other contact with Cacchiotti until April 1992 when Milley met with the investigator, Mills, who shared office space in the same building as Cacchiotti. Milley provided Mills with the same information he provided Cacchiotti seventh months prior. Mills assured Milley that he would investigate the case and contact Milley’s list of witnesses, including McNeil and Lacey. After this meeting, Milley did not see Mills until the day of his trial. Milley did not see or speak again with Cacchiotti until September 1992, when Milley came to Cacchiotti’s office unannounced because he was concerned with the lack of contact. Cacchiotti assured Milley that Mills was working hard on the case and calling the witnesses.
Milley did not hear from Cacchiotti again until May 4, 1993, when he received a phone call from Cacchiotti’s secretary informing him that the trial would begin the following day. When Milley confronted Cacchiotti about the short notice, he stated that the court had just notified him that the trial was to begin the following day. On May 5, 1993, Milley met with Cacchiotti and Mills at the courthouse. At this meeting, Cacchiotti informed Milley that McNeil would be testifying and that she identified him at the scene of the crime.[6] Cacchiotti also informed Milley that Mills had not found anything exculpatory.
Milley then testified to the events that occurred after he was found guilty and while serving his sentence. In 1995, Milley contacted both Cacchiotti and Mills by letter. He requested that Cacchiotti provide him with a copy of his case file. (Exhibit 1.) Cacchiotti responded to the letter but never sent the case file. Milley also requested that Mills provide him with copies of billing invoices and a list of the people with whom he spoke regarding the case. (Exhibit 3.) Mills never responded to the letter. Later in 1995, Milley learned through the newspaper of the alleged scheme involving Marshall, Mills, and four court appointed attorneys. See Milley, 00-P-1366, at 2; Commonwealth v. Mills, 436 Mass. 387, 389 (2002).
In 1997, Milley contacted CPCS to find out how many hours Mills billed for the investigation of his case. CPCS responded with a letter stating that Mills billed CPCS for the time period of January 7, 1992 to March 12, 1992, a total of $750. (Exhibit 4.) His invoice showed that he spent a total of 22 hours investigating the case, specifically 7 hours interviewing witnesses. (Exhibit 21.) In Mills’ second invoice to CPCS, he billed from January 14, 1993 to May 6, 1993, totaling $1000 for 29.5 hours of investigation, specifically 8.25 hours of interviewing witnesses. (Exhibit 22.) At this time, Milley filed a complaint against Cacchiotti with CPCS and the Board of Bar Overseers. In a response to his complaint, CPCS sent Milley a letter apologizing for Cacchiotti’s inadequate investigation and informed him that Cacchiotti had been barred from receiving case assignments. (Exhibit 5.)
In 1999, while still incarcerated, Milley hired a private investigator, Gilberto Rivera (“Rivera”) to locate and talk with McNeil. Rivera was able to locate and speak with McNeil and, as a result, she signed an affidavit that contradicted her trial testimony. (Exhibit 10.) Rivera was also able to get McNeil’s July 9, 1991, timecard from her place of employment. The timecard indicated that she left work at 21:03, or 9:03 p.m. (Exhibit 10.) In her affidavit she stated that it took her an hour and a half to arrive home because she used public transportation. She explained that her boyfriend, Giardina, was supposed to give her a ride home from work, but because of the police activity, he was unable to do so. At approximately 11:00 p.m., soon after she arrived home, she heard noises coming from the upstairs apartment and Giardina called the police. McNeil further stated that she was never contacted by either Cacchiotti or Mills. (Exhibit 10.) Subsequent to learning this information, Milley filed with this court his motion for a new trial.
On cross-examination, Milley was asked if he had ever seen the statements made to the police given by Giardina, McNeil, and Lacey. (Exhibits 7-9.) Milley denied ever seeing these statements to the police. In his statement, Giardina said that after the alleged rape and after the police left the scene, the suspect returned to Jane’s apartment. He called the police and “as he did the man ran, hopped a chain linked fence and disappeared.” (Exhibit 7.) He described the man as “large in size, about six feet, and heavy.” (Ex 7.) The police showed him a photo lineup with Milley’s photo in the seventh position. Giardina identified the “person in the fifth position stating that he has seen that person in the area before. Only after being shown . . . Milley’s photo did he remember seeing [him] in the neighborhood before.” (Ex 7.)
McNeil’s statement to the police said that “she had worked late the night of July 9th arriving home ... after the alleged rape.” (Ex 8.) She told her boyfriend, Giardina, that she heard noises coming from the upstairs apartment. Upon calling the police she observed “a bearded man described as being six feet, weighing 190-210 pounds run down the second-floor stairs. The man had a full beard and looked like a ‘Grizzly Adams’ type.” (Ex 8.) McNeil also looked at a photo lineup and pointed to the photo in the eighth position. Milley’s photo had been moved to the sixth position. (Ex 8.)
Lacey’s statement reported that while he was sleeping he heard a commotion coming from Jane’s apartment. He heard a bed moving on the floor and then heard a voice saying, “you’re hurting me, you’re hurting me...” (Ex 9.) He then got out of bed, walked up the stairs, and banged on the wall of Jane’s apartment. (Ex 9.) He then returned *756 to his apartment. A short time later, he saw an individual running down the stairs. He then saw Jane standing above Lacey on her back porch. Jane did not say anything to him. (Ex 9.) Lacey also told the police that Jane and her friend had been at his apartment a couple of days before and socialized with him for about an hour. When Lacey was shown the photo array he recognized the photo in the fourth position but was not sure why the individual was familiar to him. He did not choose Milley’s photo which was in the sixth position. (Ex 9.)
When the prosecutor asked Milley about Lacey’s police report, Milley stated that he did not recall Lacey banging on the walls and he never ran down the stairs. Milley recalled Jane being on the porch, but not from Lacey’s statement to the police.
b. Cacchiotti’s Testimony
Cacchiotti testified that Mills was a friend and that they had a professional relationship lasting from 1989-1996. During those years he hired Mills for most of his cases, including Milley’s. Cacchiotti testified that he instructed Mills to check the site and to interview the witnesses, and that he himself completed his own investigation by -viewing the rooming house. Cacchiotti further testified that he and Mills were unsuccessful in speaking with the residents of the rooming house, including McNeil and Lacey. He also explained that they did not speak with Jane because she had moved out of the area. Cacchiotti further stated that they did the best investigation permitted by the circumstances and that the only exculpatory evidence to be found was that the witnesses did not get a good identification of Milley. During the hearing, Cacchiotti testified that he did not know until the day before that the trial was scheduled for the following day. He asserts that he did a good job at the trial and that his trial strategy was to find inconsistencies.
Cacchiotti vehemently denied being involved with the scheme. He testified that he did use Mills quite often, but could not recall if he hired Mills for all of his cases, nor could he recall whether he always requested $1,000 from the court for Mills’ fee. (Exhibits 12-14.) Milley’s attorney, in an attempt to demonstrate Cacchiotti’s and Mills’ financial relationship, introduced a set of checks that Mills had written to the order of Cacchiotti. The checks were for the time period of 1990 to 1992 and ranged from $100 to $2,500. (Exhibits 15-16.)[7] Cacchiotti could not explain why Mills had given him these checks. Cacchiotti also denied ever giving money or loaning his condominium to Shell. In response to this denial, Milley’s attorney submitted two contradictory pieces of evidence, Shell’s indictment and Shell’s testimony during his grand jury hearing. (Exhibits 11 and 24.)
Cacchiotti also denied that he was assigned an inordinate number of cases by Marshall and that he was involved in any way with the arrangement between Marshall and Mills. On cross-examination, in an attempt to impeach Cacchiotti, Milley’s attorney submitted a CPCS document outlining defense counsel assignments for the fiscal year 1994. This document indicated that Cacchiotti received the highest compensation for criminal assignments in Middlesex Superior Court: a total of $66,959 for 2,413.50 hours. The second highest compensation was $33,750 for 1,258 hours of work. (Exhibit 29.) Also, to further impeach Cacchiotti’s testimony, Milley’s attorney submitted Aufiero’s trial testimony that she gave during Mills’ trial where she described how Marshall would always pick four specific attorneys, including Cacchiotti, to represent indigent defendants, and that all four attorneys would hire Mills as their investigator, and submit motions for funds for $1000. (Exhibit 25 p. 189.) In support of Aufiero’s testimony, Milley’s attorney submitted a number of motions for funds where Mills was the investigator, Cacchiotti was the attorney, and where the request was for $1,000. (Ex 12-14.)[8]
c. Closing Arguments
At the conclusion of the testimony both parties submitted many documents into evidence and the court heard closing arguments. Milley’s attorney argued that an actual conflict existed because of Cacchiotti’s loyalties to Mills, Marshall, and his own pecuniaiy interest. The prosecutor argued that the Appeals Court only directed this evidentiary hearing to determine whether there was an actual conflict and that this court is not to address a potential conflict. The prosecutor also stated that there was not an actual conflict if Milley only succeeded in proving that Cacchiotti received money and hired Mills to do the investigation; and that an actual conflict only existed if Cacchiotti knew at the time that Mills would perform an inadequate investigation.
DISCUSSION
A motion for a new trial may be granted “if it appears that justice may not have been done.” Mass.R.Crim.P. 30(b); Commonwealth v. Moore, 408 Mass. 117, 125 (1990). This decision is within the “sound discretion of the judge, and the judge’s disposition of the motion will not be reversed unless it is manifestly unjust. ..” Moore, 408 Mass. at 125, citing Commonwealth v. Little, 384 Mass. 262, 269 (1981). Pursuant to the remand ordered by the Appeals Court, this court must determine: 1) whether Milley’s case was “inadequately investigated or not investigated at all”; and 2) “whether those alleged failures can be linked to the defendant’s assertion of a conflict of interest of his trial counsel (as distinct from mere ineffectiveness not predicated on a genuine conflict) . . .” Commonwealth v. Milley, 00-P-1366, at 6 (June 25, 2002) (Appeals Court Rule 1:28).
I. Investigation
Upon reviewing the evidence, this court concludes that Milley’s case was at best inadequately investigated, and it is questionable whether Mills or Cacchiotti conducted any investigation at all into the matter. As will be discussed, the evidence indicates that contrary to Mills’ CPCS records, he did not interview any witnesses, and *757 that during the investigatory period, Cacchiotti failed to contact and prepare Milley prior to trial.
A. Mills
Mills did not adequately investigate Milley’s case. According to the records Mills submitted to CPCS, he documented that he investigated Milley’s case for a total of 51.5 hours, 15.25 of which he spent interviewing witnesses. However, this statement is contradicted by Cacchiotti’s testimony during the evidentiary hearing, McNeil’s affidavit, and Mills’ conviction of fraud against CPCS. During the evidentiary hearing, Milley testified that at his first meeting with Cacchiotti and at his first meeting with Mills, he provided both of them with a list of names and addresses of witnesses, including McNeil. Cacchiotti then testified that neither he nor Mills was able to contact the witnesses on Milley’s list.
As to McNeil, Cacchiotti testified that he knew she was on the witness list in January 1992 and that she continued to be on the witness list in May 1993. Cacchiotti stated that Mills had tried to contact her but that she could not be reached for an interview. However, in her affidavit dated December 1999, McNeil testified that she was never contacted by either Cacchiotti or Mills. Furthermore, neither Cacchiotti nor Mills ever attempted to obtain her timecard from her place of employment to challenge the time she had arrived at the rooming house. An investigator whom Milley hired in 1999 obtained the timecard that contradicted McNeil’s testimony.[9]
Further, it is questionable whether Mills spent the 51.5 hours investigating Milley’s case. Mills was convicted of filing false reports to CPCS during this time period, and even though he stated that he spent 15.25 hours interviewing witnesses, there is no evidence that he actually interviewed any witnesses, as evidenced by McNeil’s affidavit and by Cacchiotti’s testimony that neither he nor Mills was able to contact the witnesses. Therefore, it appears that Mills did not adequately investigate Milley’s case.
B. Cacchiotti
Regarding Cacchiotti’s performance, this court acknowledges that while it is not deciding an ineffective assistance of counsel claim, Cacchiotti’s performance as an attorney bears on whether he conducted an inadequate investigation. During the two years prior to trial, Cacchiotti rarely communicated with Milley and failed to prepare Milley for trial. It appears that Cacchiotti’s failure to keep Milley informed was due to the lack of investigation completed in his case. Cacchiotti first met with Milley in December 1991, three months after being assigned to the case. In April 1992, he again met with Milley, but only to introduce him to Mills. Between April and September, Milley was unsuccessful in contacting Cacchiotti even though he called Cacchiotti’s office on a weekly basis, and went there on two occasions in an attempt to discuss the case with him. Finally, in September 1992, Milley surprised Cacchiotti with another visit and spoke with him for five minutes. Cacchiotti told him that Mills was working hard and that Mills had called many of the witnesses. This statement contradicts McNeil’s affidavit and Cacchiotti’s testimony that he and Mills were unable to contact any of the witnesses. Further, it suggests that Cacchiotti avoided Milley because he could not provide him any information.
Milley did not hear from Cacchiotti again until May 4, 1993, the day before the trial, when Cacchiotti’s secretary called to inform him that the trial was the following day. Cacchiotti stated that he gave Milley short notice because he did not know the trial was scheduled for the following day. On May 5, 1993, the morning of the trial, Milley met with Cacchiotti and Mills to discuss the trial. At that time, Cacchiotti informed Milley that McNeil would be a witness and that Mills had not found any exculpatory evidence. During the trial, Cacchiotti’s unpreparedness became apparent when he failed to: question McNeil about the timing of events; question Jane about the last time she saw Milley; and subpoena the other two witnesses, Giardina and Lacey, who provided statements to the prolice.
During cross-examination of McNeil, Cacchiotti questioned her about her incorrect photo identification of Milley. He did not question her about when she left work, how long it took her to arrive home, or what time she arrived home. By not asking these questions, Cacchiotti allowed McNeil’s testimony to stand unchallenged that she left work at 8:30 p.m. and arrived home between 9:00 p.m. and 11:00 p.m., enabling the jury to assume she was home at 9:30 p.m. However, if Cacchiotti or Mills had obtained McNeil’s timecard, which indicated that she had left work at 9:03 p.m., Cacchiotti would have been able to place doubt in the jurors’ mind as to whether McNeil had arrived home by 9:30 p.m., in time to hear the struggle. Cacchiotti also failed to ask McNeil about the time she called the police and the time they arrivedall of which were important details because they conflict with Jane’s testimony that the incident occurred at 9:30 p.m. McNeil heard a struggle shortly before the police arrived, which, based on the officer’s testimony was between 11:00 p.m. and 11:30 p.m.
Cacchiotti also failed to question Jane on whether the last time she saw Milley was at 9:30 p.m. on the night of the incident. This line of questioning would have been important because Giardina told the police that the suspect returned later that night and he called the police. However, Jane never testified that Milley returned to the scene. Furthermore, Giardina did not identify Milley as the suspect in the photo lineup. The other witness, Lacey, would have also been beneficial for the defense because he had met Milley a couple of days before the incident, but was unable to identify Milley in the photo lineup. All of these statement would have assisted in Milley’s defense; however, because of a lack of investigation, Cacchiotti did not call any of these witnesses to the stand.
Furthermore, CPCS also concluded after its own investigation of Milley’s complaint that Cacchiotti had “missed important cross-examination material due to *758 inadequate investigation.” Due to this finding, Cacchiotti was barred from receiving further case assignments. The fact that Mills had not interviewed any witnesses, which as a result caused Cacchiotti to be unprepared for trial, supports this court’s conclusion that Milley’s case was inadequately investigated.
II. Genuine Conflict of Interest
This court must now determine whether the inadequate investigation is linked to the genuine conflict of interest allegation against Cacchiotti. See Milley, 00-P-1366, at 6. A criminal defendant is “entitled to the untrammeled and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others.” Commonwealth v. Martinez, 425 Mass. 382, 388 (1997), quoting Commonwealth v. Michel, 381 Mass. 447, 453 (1980). “A genuine conflict of interest arises where the ‘independent professional judgment’ of trial counsel is impaired by a conflict between the interests of his client and his own interests, or the interests of another client.” Commonwealth v. Dahl, 430 Mass. 813, 817 (2000), citing Commonwealth v. Shraiar, 397 Mass 16, 20 (1986). Once a genuine conflict of interest has been proven, the defendant does not have to demonstrate any prejudice that resulted from the conflict. See Commonwealth v. Hodge, 386 Mass. 165, 167-68 (1982).
To prevail on his conflict of interest claim, Milley must provide “adequate evidence of its existence . . . [by showing] demonstrative proof detailing the precise character of the alleged conflict of interest.” Commonwealth v. Davis, 376 Mass. 777, 781 (1978). Milley has the burden to prove, “without relying on mere conjecture or speculation, that a genuine conflict existed.” Commonwealth v. Waller, 396 Mass. 549, 554 (1986). In meeting this burden, Milley may offer demonstrative evidence by referencing the trial record or by providing extrinsic evidence. See Davis, 376 Mass. at 781.
Generally, a genuine conflict of interest exists when there is either joint representation of co-defendants with inconsistent defenses, or dual representation of a defendant and an adverse witness. See Shraiar, 397 Mass. at 19. This court notes that Milley’s allegation of a genuine conflict of interest is not based upon either of those circumstances, but instead is based upon Cacchiotti’s financial interest. Although it is rare for a conflicts claim to be based on the attorney’s financial interest, the Supreme Judicial Court has addressed this situation in at least one other case. See Commonwealth v. Hodge, 386 Mass. 165, 168 (1982).
In Hodge, the Court concluded that the defendant had successfully proven a conflict of interest claim predicated on the attorney’s financial interest. 386 Mass. at 168. In that case, a client of the defendant’s attorney was a witness for the prosecution. See id. at 167. During the trial, the defendant’s attorney failed to vigorously cross-examine this witness. See id. The Court concluded that by failing to vigorously cross-examine the witness, the attorney was acting in his own best interest and not in the defendant’s interest. See id. at 168. The Court deemed a conflict existed, thus it refrained from suggesting reasons for the lack of cross-examination because the defendant did not need to prove prejudice.[10] See id.
As in Hodge, this court concludes that a genuine conflict of interest exists between Milley and Cacchiotti based upon Cacchiotti’s pecuniary interest. The evidence reflects that: (1) Mills and Marshall were involved in a scheme to steal money from the Commonwealth: (2) Marshall appointed Cacchiotti to a significant number of cases; (3) Marshall and Mills, along with Cacchiotti and Mills, had a close personal and work relationship; and, (4) in furtherance of obtaining cases, Cacchiotti routinely chose Mills as his investigator.
First, the evidence clearly establishes that it was important for Cacchiotti to maintain a good relationship with Marshall in order to continue being appointed to a significant number of Middlesex County cases. As reflected in Aufiero’s trial testimony given at Mills’ trial, Marshall and Cacchiotti were friends, and she would often see Cacchiotti socializing with Marshall in his office. She also testified that Marshall would deviate from established procedures by calling on Cacchiotti to represent indigent defendants when the “duty attorney” was not available. She further testified that even when Cacchiotti did not have a case or was not on the bar advocate list for that day, he would be in Marshall’s courtroom while defendants were being assigned counsel. This relationship was beneficial for Cacchiotti, as reflected in the CPCS records for the fiscal year 1994. These records indicate that Cacchiotti received the highest compensation for criminal assignments in Middlesex Superior Court, a total of $66,959, and that the second highest compensation was $33,750. Cacchiotti knew that he had to continue good relations with Marshall in order to maintain his income.
Second, the evidence demonstrated that Marshall and Mills had a close relationship. During Mills’ trial, Aufiero testified that Mills was in Marshall’s office on a daily basis, for at least three hours a day.[11] Aufiero also stated that Mills was always in the office when Marshall was stamping the motions for funds, and that they would review the NAC binder counting the number of appointments obtained by Cacchiotti and the other three attorneys. Aufiero also testified that whenever the four attorneys, including Cacchiotti, received a case, they would use Mills as their investigator and would always submit motions for fees in the amount of $1,000.[12]
The evidence also demonstrated that Cacchiotti and Mills were good friends. Cacchiotti testified that he and Mills had been friends since 1989 and that they were tenants in the same Everett office building. Cacchiotti acknowledged that he often used Mills as his investigator. During the hearing, Milley introduced evidence indicating that in 1992, Mills sold a condominium located in Florida to Cacchiotti. Milley also introduced Shell’s grand jury testimony to the effect that between 1992 to 1995, both Cacchiotti and Mills had given him money and *759 invited him to use the Florida condominium as a way to thank him for immediately processing their motions.[13] This evidence establishes not only that Cacchiotti and Mills were good friends, but also that they had been involved with providing court personnel with monetary incentives and rewards to further their own interests.
Finally, because of the dynamics of the relationship among Marshall, Mills, and Cacchiotti, Marshall correctly assumed that Cacchiotti would hire Mills as the investigator in his cases. As Aufiero testified, the four attomeys who received assignments from Marshall always used Mills as their investigator, and Mills and Marshall frequently went through the NAC binder to determine which cases had been assigned to Cacchiotti. It can be fairly inferred that one reason Marshall selected Cacchiotti as the attorney on many of the cases was not only because of their friendship, but also because Marshall knew that Mills would be the investigator, thereby furthering both Marshall’s and Mills’ interests in the scheme of which they were ultimately convicted. This court concludes that Cacchiotti had a financial incentive to hire Mills, regardless of his work product, in order to continue to receive cases which financially benefitted him. Because of his financial interest, Cacchiotti had a loyaly to Marshall and Mills, and that allegiance affected his representation of Milley. See Martinez, 425 Mass. at 388.
The Commonwealth argues that even if Milley proves that Cacchiotti was involved with the scheme, Milley still has to prove that Cacchiotti knew Mills would inadequately investigate his case. However, in a genuine conflict situation, “the defendant is not to be put to the burden, perhaps insuperable, of probing the resolve and the possible mental conflict of counsel. Both the potential for prejudice and the difficulty of proving it are apparent, particularly as to things that may have been left not said or not done by counsel.” Commonwealth v. Cobb, 379 Mass. 456, 461 (1980).
This court concludes that Milley has produced sufficient evidence to meet his burden of establishing a genuine conflict of interest. Cacchiotti denies any involvement in the scheme and this court recognizes that he was never indicted, much less convicted, for his alleged involvement. However, his relationship with Marshall and Mills, coupled with the many appointments he received from Marshall in Middlesex County, makes it clear to this court that Cacchiotti did have a financial interest in choosing Mills as his investigator, regardless of whether Mills would conduct an adequate investigation.
III. Potential Conflict of Interest
Assuming that Cacchiotti’s knowledge and participation do not amount to an actual conflict, Milley can still prevail if he demonstrates the existence of a potential conflict between Cacchiotti and himself. See Shraiar, 397 Mass. at 24. To prevail on a potential conflict daim, Milley would have to provide sufficient evidence that there was actual prejudice. See Commonwealth v. Fogarty, 419 Mass. 456, 459 (1995). Actual prejudice is determined under the same standard applicable to an ineffective assistance of counsel claim. See Commonwealth v. Croken, 432 Mass. 266, 272 (2000). When incompetency is determined, then the court must conclude whether the defendant was deprived of an otherwise available, substantial ground of defense. See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). If the defendant can establish that better work might have accomplished something material for the defense, the court must reverse the conviction. See Commonwealth v. Whitman, 430 Mass. 746, 757 (2000).
The evidence provides that Cacchiotti was inattentive throughout Milley’s case. During the two-year period before the trial, Cacchiotti never called or returned Milley’s phone calls. When Milley would reach him, Cacchiotti would quickly tell him that the case was being investigated and that he and Mills were calling witnesses. After Milley spoke with Cacchiotti in September 1992, he did not hear from Cacchiotti again until May 4, 1993, the day before his trial. Contrary to Cacchiotti’s testimony, Cacchiotti and Mills never contacted any of the witnesses, specifically the key witness McNeil.
The lack of investigation was apparent during trial where Cacchiotti’s performance “resulted from neglect or ignorance rather than from informed, professional deliberation.” Commonwealth v. Swan, 38 Mass.App.Ct. 539, 543 (1995), quoting Marzullo v. Maryland, 561 F.2d 540, 544 (4th Cir. 1977). As previously discussed, when McNeil took the stand, Cacchiotti’s cross-examination only reiterated her direct testimony. Although Cacchiotti did question McNeil about her photo identification, he never questioned her about what time she came home or what time she heard the noises from the upstairs. Furthermore, Cacchiotti did not subpoena the other two witnesses to testify that the suspect returned after the alleged rape, yet, Jane never testified that Milley returned to the scene. Furthermore, neither of these witnesses was able to identify Milley. Finally, CPCS’s investigation of Milley’s complaint resulted in the conclusion that Cacchiotti had “missed important cross examination material due to inadequate investigation.” Due to this finding, CPCS barred Cacchiotti from receiving further case assignments. Therefore, had a proper investigation been conducted, something material might have appeared for the benefit of the defendant. Accordingly, Milley was prejudiced by the lack of investigation and preparation for his trial.
IV. Commonwealth v. Peguero
Even though this court concludes that Milley has established his conflict of interest claim, this court will address why Milley’s case is distinguishable from its companion case, Commonwealth v. Peguero, 00-P-634 (June 25, 2002) (Appeals Court Rule 1:28), which was decided by the Appeals Court on the same day the Appeals Court decided this case. In its argument before this court, the Commonwealth relies upon the Appeals Court opinion in Peguero affirming the denial of the *760 motion for a new trial in which the defendant raised similar claims against Cacchiotti. Commonwealth v. Peguero, 00-P-634 (June 25, 2002) (Appeals Court Rule 1:28).[14] The Commonwealth argues that Milley’s argument repeats the unsuccessful argument asserted in Peguero and for those reasons should be denied. However, the facts in Milley are clearly distinguishable.
In Peguero, the defendant was convicted of trafficking in cocaine and sentenced to a term of five to seven years. Commonwealth v. Pequero [sic], 94-195-001, at 1 (March 10, 2000) (Grasso, J.). Peguero sought a new trial alleging that his attorney, Cacchiotti, had a conflict of interest because of his involvement with the scheme. See id. at 3. As noted by the trial judge, however, Peguero did not satisfy his burden of establishing either a genuine or a potential conflict of interest claim because he provided merely speculative evidence as to the scheme, and further provided no evidence as to how the scheme affected his case. See id. He only argued that because there was a scheme involving his attorney, he should be granted a new trial. See id. (“Pequero [sic] concedes that he is unable even to suggest how adequate investigation might have made a difference in his case”). Justice Grasso also concluded that this was not a potential conflict case because “the allegation of inadequate investigation must be viewed ‘in light of the overwhelming, indeed incontrovertible, evidence connecting [Pequero] [sic] with the seized drugs.’ ” Id. at 5, quoting Commonwealth v. Davis, 376 Mass. 777, 783 (1978). Conversely, Milley has provided sufficient evidence that if witnesses had been interviewed, the results might have affected his case.
It is the opinion of this court that Mills and Cacchiotti did not adequately investigate the case. In the Pequero [sic] decision, Justice Grasso stated that Peguero had not provided any evidence to suggest that the scheme “might impair Cacchiotti’s professional judgment regarding whether the investigation would benefit Peguero or might cause Cacchiotti to do less investigation on Peguero’s behalf than would otherwise be called for in the exercise of professional judgment.” 94-195-001, at 5. In the case before this court, Milley has proven that Cacchiotti’s financial interest in obtaining cases from Marshall resulted in an inadequate investigation that adversely affected Milley.

ORDER

For the foregoing reasons it is hereby ORDERED that Milley’s Motion for a New Trial is ALLOWED.

“Jane Doe” is a pseudonym to protect the victim’s identify.

On cross-examination, Jane corrected the date to be July 6, 1991.

This testimony regarding responding to a call at 11:30 p.m. conflicts with McNeil’s testimony that the police arrived shortly after she saw the suspect leave, and Jane’s testimony that the rape occurred at 9:30p.m. Jane does not testify that Milley returned to the scene.

Cacchiotti continued to ask questions regarding the relationship between the tenderness and a woman’s menstrual cycle. The trial judge did not allow this line of questioning to continue because Cacchiotti had no evidence to suggest that at the time of the incident Jane was on her menstrual cycle.

The police reports would have assisted Cacchiotti in impeaching McNeil’s identification of Milley. On July 30, 1991 and August 5, 1991, the Everett Police interviewed three witnesses: James Giardina (“Giardina”), McNeil, and Lacey, none of whom correctly identified Milley in a photo lineup. (Exhibits 7-9.) The police reports are discussed further infra.

This is an inconsistent statement because based on McNeil’s statement to the police, she did not identify Milley in a photo lineup.

There were a total of five checks introduced into evidence: 1) August 30, 1990, for a total of $1,600; 2) April 15, 1991, for a total of $100; 3) December 11, 1991, fora total of $2,500; 4) March 18, 1992, for a total of $330.85; and 5) September 9, 1992, for a total of $1,000.

These motions include: 1) Kenneth Dykens, signed by Shell on February 2, 1994; 2)Kenneth Dykens, signed by Shell on March 17, 1994; and 3) Helen Mercer, signed by Marshall on August 26, 1994. The following motions were all signed by Marshall on July 25, 1994: 1) James Brooks; 2) Sean Tracey; 3) Eduardo Garcia; 4) David Comalli; 5) Paul Boudreau; 6) Dean Burgress; 7) Jose Luis Colon; 8) Micahel Gilmartin; 9) James Bond; and 10) Laurence Trantthis motion was for $2,500.

The Commonwealth’s theory was that the rape occurred at 9:30 p.m. According to the timecard, McNeil left work at 9:03 p.m. It took her an hour-and-a-half to get home by public transportation. She did not arrive home until a few minutes before 11 p.m. At trial, she testified that she left work at 8:30 and arrived home between 9:00 and 11:00 p.m., enabling the jury to assume that she could have been home at 9:30 p.m.

The Court concluded: “We do not suggest that the decision not to cross-examine . . . was in fact due to [the attorney’s] reluctance to antagonize him, or that [the attorney] at any time was motivated by anything other than Hodge’s best interest.” Hodge, 386 Mass. at 168.

This testimony was also supported by Shell’s grand jury testimony in which he stated that Mills was always in Marshall’s office.

In support of this statement, Milley produced a number of motions where Cacchiotti was the attorney. Mills was the investigator, and the request was for fees in the amount of $1000.

During the hearing, the Commonwealth objected to the entering of Shell’s grand jury testimony as hearsay. The Commonwealth noted that it would wait for this court’s decision before making its appeal. The Commonwealth presented Shell’s testimony to a grand jury in 1997 regarding the scheme that it was attempting to prosecute. In May 2003, Milley’s defense attorney submitted the transcript of Shell’s 1997 grand jury testimony to establish the exact same factthe existence of the scheme. The grand jury testimony constitutes an admission by the Commonwealth and is trustworthy testimony. Thus, it cannot now claim that the transcript is hearsay. See U.S. v. Kattar, 840 F.2d 118, 131 (1st. Cir. 1988); U.S. v. GAF Corp., 928 F.2d 1253, 1260-61 (2d. Cir. 1991).

In its decision, the Appeals Court relied upon the Superior Court’s memorandum of decision denying Peguero’s motion. See Commonwealth v. Pequero [sic], 94-195-001 (March 10, 2000) (Grasso, J.).